# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JILL A. SWINDOLL,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number: |
| | ) | **2:09-cv-1200-AKK** |
| **OTTO BOCK HEALTHCARE, L.P.,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the court is Defendant Otto Bock HealthCare's ("Defendant") motion for summary judgment. Doc. 16. Plaintiff Jill A. Swindoll ("Plaintiff") has responded, (doc. 19), and Defendant has replied, (doc. 23). Accordingly, this matter is ripe for the court's review. For the reasons stated fully below, Defendant's motion is GRANTED, and this action is DISMISSED with prejudice.

## I.  PROCEDURAL HISTORY

Plaintiff, who was forty at the time of her discharge, commenced this action on June 15, 2009, alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, ("ADEA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). Doc. 1. Additionally, Plaintiff alleges state law claims for conversion, unjust enrichment, and a violation of Ala.

Code § 8-24-2 *et seq.* (1975).

## II.  FACTUAL BACKGROUND

The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the relevant facts set forth below.

Defendant, a provider of orthopaedic rehabilitation devices designed to assist people with physical mobility challenges, hired Plaintiff as a sales representative in January 2005, when it acquired Plaintiff's then-employer.  Doc. 19 at 2.  Plaintiff's primary duties included the sales and service of Defendant's products throughout Alabama and the Florida panhandle.  *Id*. at 2.  In addition to her salary, Plaintiff also earned commission based on her sales "allowables," that is, the amount the insurance companies paid for the products she sold.  *Id*. at 3; Doc. 18-1 at 12-13 (Dep. p. 44-45).

Defendant expects its sales representatives to meet monthly sales quotas, which it sets at corporate level, based on the sales representative's "actuals" (meaning actual revenues received) from the previous year and a slight adjustment upward to encourage them to grow their territories and sales.  Doc. 18-3 at 3. Generally, Defendant assigns Patient Service Representatives ("PSR") to sales representatives who consistently meet their monthly sales goals in excess of $30,000, to assist with the delivery and maintenance of devices.  Doc. 18-3 at 4.

However, to ensure that sales representatives always have assistance even when their sales fall below $30,000, Defendant allows them to hire independent contractors to assume PSR duties on those occasions when a PSR is not assigned to their territory.  *Id*.

Despite a productive year in 2006, Plaintiff's sales began to decline in 2007. Doc. 18-1 at 24 (Dep. p. 89).  As a result, Plaintiff received several verbal warnings from her supervisor, Tad George ("George"): "I do recall Tad expressing concern for the territory."[1] Doc. 18-1 at 25 (Dep. p. 93); *see also* Doc. 18-3 at 4. Because Plaintiff only attained 58% of her sales quota in 2007, Defendant terminated the male PSR assigned to her territory.  Doc. 18-3 at 4, 13.  However, consistent with Defendant's practice, Plaintiff hired several independent contractors, when necessary, to perform PSR duties for her territory.   Doc. 18-3 at 4-5.

Plaintiff's negative sales trend continued into 2008.  Although she "showed some improvement" in January, her $24,740 in sales for January still fell below the 100% expected sales quota.  Doc. 18-3 at 4, 13.  Moreover, in February, she

---

[1] Defendant hired Tad George as its Southeast Regional Sales Manager in March 2007.  Doc. 18-3 at 2.  Plaintiff received her monthly sales quotas for 2007 after George started: "we didn't get our 2007 numbers until after Tad started."  Doc. 18-1 at 24 (Dep. p. 90).  Prior to George, "we would start the month and have no idea what the target was."  *Id*.  However, "after . . . [George] started, he did give them to us for the rest of the year."  *Id*. (Dep. p. 91).

dropped to $7,990 (21% of her sales quota), (*id.*), which Plaintiff blamed on a vacation she took that month, (doc. 18-1 at 25 (dep. pp. 93-94)).  However, Plaintiff acknowledged responsibility for the drop: "But that 21% to quota [for February] is all mine.  I take responsibility for it."  *Id*. (Dep. p. 95).

In light of her continuing decline, on March 7, 2008, George placed Plaintiff on a three-month corrective action plan with a target sales goals of 70% of her original forecast for March and April and 75% for May.  Doc. 18-3 at 5-6.  Plaintiff "felt that [she] deserved to be written up" and did "not feel like those numbers [*i.e.*, the goals] were unreasonable."  Doc. 18-1 at 25 (Dep. pp. 95-96).

Plaintiff met the reduced monthly sales goals for March and April, but fell short of the May 75% forecast goal of $32,202 by $3,220.  Doc. 18-1 at 25 (Dep. pp. 92-96).  Consequently, on June 3, 2008, George met with her and presented her two options:  agree to a demotion to a PSR position for the Birmingham market with a base salary increase and company car, or termination and two weeks severance.  Doc. 18-2 at 55; Doc. 18-3 at 6.  Although the demotion to PSR would have resulted in a base salary increase, Plaintiff would have earned less compensation overall since sales representatives also earned commissions.

Plaintiff rejected the demotion the following day and informed George that she believed the two weeks severance was discriminatory and unfair since

Defendant gave a higher severance to a former male employee.  Doc. 18-2 at 62-
63.  Plaintiff requested instead a year's salary as severance.  *Id.* at 63.  Moreover,
Plaintiff advised George that she failed to meet her May sales forecast goal due to
a billing error.  Doc. 18-1 at 25 (Dep. p. 97-98); Doc. 18-2 at 62.  George
promised to notify Human Resources of her contentions.  Doc. 18-3 at 6.

On June 13, 2008, in response to Plaintiff's billing error claims, George
revised Plaintiff's initial Performance Corrective Form to account for this error.
Doc. 18-3 at 6.  This revision adjusted Plaintiff's May total to $30,482 and
reduced her deficit from $3,220 to $1,720, which meant she still fell short of the
May 75% target goal of $32,202.  *Id*. at 5-6.  However, George delayed the
decision to demote or terminate Plaintiff to give her the "benefit of the doubt that
her May numbers were low due to problems in the billing department."  *Id*. at 6.
On June 13, 2008, George revised Plaintiff's Performance Corrective Action to
give her a new combined revenue attainment goal of 75% for July and August.  *Id*.
He combined July and August "to eliminate the chance that delays in billing could
negatively affect her sales numbers."  *Id*.  George advised Plaintiff that she must
bill $61,560 collectively in July and August to retain her position.  Doc. 18-3 at 6-
7.  Under this revised plan, in theory, Plaintiff could have retained her job based
on one strong month, as long as she totaled $61,560 at the end of the two month

period.

On July 3, 2008, Plaintiff completed an online Equal Employment Opportunity Commission ("EEOC") questionnaire, in which she stated that Defendant discriminated against her by threatening to demote or terminate her without cause, and retaliated against her by placing her on a second corrective action.[2]  Doc. 18-2 at 69.  George learned of Plaintiff's discrimination allegation sometime later that month when he and Chuck Grosso ("Grosso"), National Sales Manager, contacted Plaintiff by phone to discuss her work performance.  Doc. 18-3 at 7.  George told Plaintiff during this conversation "that it just wasn't working out."  Doc. 18-1 at 35 (Dep. pp. 134-35).  When the conversation ended, Plaintiff called George and Grosso back and informed them that she had filed a discrimination complaint with the EEOC.  Doc. 18-3 at 7; *see also* Doc. 18-1 at 35 (Dep. p. 134).  Thereafter, George contacted Pat Chelf, National Sales Director, to notify him of the conversation and Plaintiff's discrimination complaint.  Doc. 18-3 at 7.

Plaintiff failed to meet the combined minimum sales forecast goal for July and August.  Doc. 18-3 at 7.  Although George made clear to Plaintiff in the June corrective action plan that she needed to generate 75% of her revenue forecast of

---

[2]Plaintiff filed a formal EEOC charge of discrimination against Defendant on November 18, 2009.  On March 17, 2009, the EEOC issued Plaintiff a right-to-sue letter.

$82,080 (*i.e.*, $61,560) to retain her job, Defendant only received $27,220 in <u>total</u> revenue from Plaintiff's accounts. *Id.* Specifically, Defendant received $10,749 (26% of forecast) in July and $16,471 (40% of forecast) in August. *Id.* As a result, Defendant discharged Plaintiff on September 2, 2008. Doc. 18-3 at 8.

Defendant contends it replaced Plaintiff with Mary Ware, a fifty-two year old female. Doc. 18-3 at 8. Plaintiff disagrees and contends that Defendant replaced her with Travian Williams, a male in his twenties or thirties who previously worked for her as an independent contractor performing PSR duties. Doc. 18-1 at 34 (Dep. p. 129). Plaintiff alleges that on June 3, 2008, after George met with her and asked her to resign or accept a demotion, George interviewed Williams for a PSR position and hired Williams sometime after her discharge in September. Doc. 18-1 at 34 (Dep. pp. 129-30). Plaintiff contends also that Defendant has a pattern of terminating older women and frequently promoting male PSRs to sales representative positions. Doc. 19 at 15. Finally, Plaintiff alleges that Defendant discharged her in retaliation for her EEOC complaint. Doc. 19 at 16.

### III.  SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id*. at 324 (internal citations and quotations omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence in the light most favorable to the nonmoving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## IV.  ANALYSIS

### A.    Plaintiff failed to make a *prima facie* case for age and gender discrimination for her discharge.

Plaintiff alleges that Defendant discriminated against her by unlawfully discharging her because of her age[3] and gender.   To prevail, Plaintiff must make a

---

[3] Plaintiff was forty years old at the time of her discharge.  Doc. 19 at 1.  George, who discharged her, was forty-seven.  Doc. 18-3 at 1.  The Eleventh Circuit has noted that a plaintiff faces a

*prima facie* case by showing that: "she was a qualified member of a protected class and was subjected to adverse employment action in contrast to similarly situated employees outside the protected class." *Alvarez v. Royal Atl. Developers, Inc.*, — F.3d —, 2010 WL 2631839, at *7 (11th Cir. July 2, 2010) (citation omitted). However, "[t]he methods of presenting a *prima facie* case are flexible and depend on the particular situation." *Id.* (citation omitted).

The parties agree that Plaintiff is a member of a protected class, that her discharge is an adverse employment action, and that she possessed the general qualifications to perform the duties of the job in question. Although Plaintiff does not contend that she can show that Defendant treated similarly situated employees outside her protected class more favorably,[4] Plaintiff claims nonetheless that she can make a *prima facie* case because, allegedly, Defendant replaced her with a younger male, Travian Williams.[5]   Doc. 19 at 7, 14.  In making this assertion,

difficult burden in establishing age discrimination when the decision-maker is also in the protected class. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (Plaintiff faced a "difficult burden" when "all of the primary players behind his termination . . . were well over age forty . . . [and] more likely to be the victims of age discrimination than its perpetrators."). As discussed further here, Plaintiff failed to meet her burden of establishing that age animus factored in any of the employment decisions she challenges.

[4] This is not surprising since there is no evidence that Defendant failed to discharge males or younger employees who engaged in similar conduct. In fact, the evidence is to the contrary. Like Plaintiff, Defendant discharged Tom Parker, a sales representative, for failing to meet his sales goals. Doc. 18-3 at 8-9; Doc. 18-1 at 31 (Dep. p. 119).  Therefore, as it relates to the termination, Plaintiff cannot establish that Defendant treated her less favorably than similarly situated employees.

[5] Plaintiff can, in fact, make a *prima facie* case by showing that Defendant replaced her with someone outside her protected class. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 ("had [the

Page 9 of  30

Plaintiff takes issue with Defendant's contention that it replaced her with Mary Ware, a fifty-two year old woman.  *Id.* at 14; *see also* Doc. 18-1 at 34 (Dep. p. 129).  Plaintiff's contention is flawed in several respects.

First, she admits that Defendant interviewed Williams for a PSR position. Doc. 18-1 at 34 (Dep. p. 129).  PSRs provide support to sales representatives, (doc. 18-3 at 4), and have different and inferior responsibilities.   Indeed, on June 4, 2008, Plaintiff turned down a demotion to a PSR  position because she viewed it as a lower level position.  In light of her testimony, the court is confounded by her contention that Williams replaced her, especially since she attacks Defendant's assertion that it replaced her with Ware by claiming that Defendant hired Ware instead for a lower level sales agent position, that this position is different from hers, and that there is no evidence that Ware "performed any of the same duties as Plaintiff."  Doc. 19 at 14.  Because a PSR position is, likewise, not identical to hers, Plaintiff faces the same evidentiary flaws – *i.e.*, she has no evidence at all that Williams "performed any of the same duties as [her]."  *Id.*

Second, Plaintiff provided no evidentiary support for her contention that Defendant hired Williams sometime after her discharge.   In fact, the record is

---

defendant] not hired [someone within the plaintiff's protected class] . . . its actions may have been suspect.").

silent on whether Defendant even hired Williams,[6] and if so, when it did and for what position.  All Plaintiff can establish is that she saw George interview Williams for a PSR position on June 3, 2008, three months <u>before</u> her discharge. Doc. 18-1 at 34 (Dep. pp. 129-130).  Absent further evidence showing that Defendant actually hired Williams and for precisely what position, Plaintiff's claim that Defendant hired Williams as her replacement is pure conjecture and speculation.  "[U]nsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion.  Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."  *Cordoba v. Dillard's Inc.,* 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995).  Consequently, Plaintiff's *prima facie* case of age and gender discrimination, as it relates to her discharge, fails.

**B.    Plaintiff cannot establish that Defendant's reasons for her termination are pretext for discrimination.**

Alternatively, even assuming that Plaintiff makes a *prima facie* case, her age and gender discharge claims still fail because Defendant articulated legitimate, nondiscriminatory reasons for her discharge.  Specifically, Defendant contends that it discharged Plaintiff because of her failure to meet target sales goals,

---

[6] Plaintiff claims Defendant hired Williams after her discharge.  Doc. 18-1 at 34 (Dep. pp. 129-30).

reluctance to grow the Alabama territory and overall poor performance.  Doc. 18-3 at 4-8.   In support of its contention, Defendant points to Plaintiff's March Performance Corrective Action regarding her poor sales for the 2007-2008 year. After Plaintiff hit only 58% of her targeted sales in 2007 and 62% of her sales goals for the first quarter of 2008, her supervisor, George, met with her in March 2008 and advised her that she needed to improve her sales performance.  He set reduced targets for her and made clear that failure to meet them would result in her discharge.  Doc 18-3 at 5.

When Plaintiff failed to meet the May target, George met with her on June 3, 2008, and gave her the option of a demotion or discharge with severance.  *Id.* at 6.  Plaintiff rejected these options, and because she blamed her failure to meet the May target on a billing problem, George gave her a second chance to improve by setting reduced targets for July and August.  *Id.*  Specifically, on June 13, 2008, George asked Plaintiff to attain only 75% of her goal for the combined months of July and August, to eliminate the chance that delays in billing might negatively affect her sales.  *Id.*  She generated roughly $27,000 in revenue for both months, (doc. 18-3 at 7), far less than the $61,560 she needed to meet the 75% target, (*id.*; doc. 18-1 at 33 (dep. p. 127)).  As a result, Defendant discharged her on September 2, 2008.  Doc. 18-3 at 8.

The court finds it significant that for a six-month period beginning in March 2008, George never asked Plaintiff to meet 100% of her sales goal.  For example, for July and August, Plaintiff's actual combined revenue forecast was $82,080.  That is, Defendant expected her to generate $82,080 in sales based on the sales forecasts it set for her and other employees at the start of the year.  However, because of her performance issues, Defendant only asked her to attain 75% of the July and August goals to retain her job.  Despite this generous reduction in expectations, Plaintiff still failed to meet the reduced target.  Collectively, for the six-month period in question, she met the reduced goals in two of the months (March and April), failed to do so three times (May, July, and August), and received a free pass for June.  Needless to say, that is hardly the type of performance that justifies continued employment.

Because Defendant has articulated nondiscriminatory reasons for the discharge, Plaintiff can only survive summary judgment if she presents sufficient evidence of pretext.  *Alvarez*, 2010 WL 2631839, at *7-8.  "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside the decision maker's head."  *Id.* at *8 (citation omitted).  As an initial matter, the court notes that Plaintiff does not challenge Defendant's contention that she failed to meet the July and August

combined billing target.  Doc. 18-1 at 34 (Dep. p. 130).  Plaintiff contends instead
that Defendant's reasons are pretextual because Defendant (1) threatened to fire
her on June 3, 2007, "after three months of successful billing," (2) has a "general
[negative] attitude toward female employees," and (3) "inexplicabl[y]
miscalculat[ed]" her May sales.  Doc. 19 at 19-21.  As shown below, these reasons
fail to establish that Defendant's reasons for her discharge are pretextual.

As to Plaintiff's contentions that Defendant "inexplicabl[y] miscalculat[ed]"
her May sales and that she had three consecutive successful months of billing, it is
undisputed that Defendant failed to account for one of Plaintiff's May sales when
her supervisor, George, met with her on June 3, 2008.  However, when Plaintiff
flagged this issue on June 4, 2008, George revised Plaintiff's tally to include this
sale.  Doc. 17 at 7.  Significantly, despite the inclusion, Plaintiff still fell short of
the May billing target.  In other words, contrary to Plaintiff's assertions, she never
had "three months of successful billing."  In that regard, Plaintiff's contention that
Defendant intentionally excluded the May sale to get rid of her misses the mark
since its inclusion still left her short of the mandated target.  Moreover, since
Defendant had the right to discharge her after she fell short in May, Defendant's
decision to give her two additional months to improve belies her contention that
Defendant wanted to get rid of her and that its reasons for ultimately discharging

her are pretextual.

With respect to Plaintiff's final pretext contention that Defendant has a "general [negative] attitude toward female[s]," Plaintiff alleges that Defendant has a demonstrated pattern and practice of treating males favorably over females by failing to promote females and discharging Plaintiff.  Doc. 19 at 20-21.  To support her claim, she offers several examples of former female employees George allegedly denied a promotion or whom George or Defendant terminated.  *Id*. Specifically, Plaintiff claims that Defendant terminated  JoAnn Pelligrino and, as it relates specifically to George, that he "set up" Michelle Priselac "in order to make her quit,"[7] and denied Maria Martens advancement opportunities by promoting her from PSR to the lower sales associate position and promising to promote her to sales representative if she reached certain goals.  *Id*. at 14-15, 20-21.   Plaintiff claims also that Defendant promoted Amy Eddings from PSR to sales associate instead of to sales representative.  *Id.* at 21.  Finally, Plaintiff claims George denied Martens, and Defendant denied Eddings, the training necessary for a promotion to sales representative.  *Id*. at 20-21.

Plaintiff's reliance on Pelligrino, Priselac, Martens and Eddings misses the

---

[7] Priselac resigned after Defendant confronted her with evidence of mileage reimbursement padding.  She was thirty-two when she resigned.  Doc. 18-3 at 9.

mark for several reasons.  First, her evidence about their alleged treatment is rank

hearsay, based on what Priselac, Martens and/or Eddings told her, or what she

heard from others about them or about Pellegrino.  Doc. 19 at 14-15, 20-21; Doc.

18-1 at 36-37, 40-41 (Dep. p. 139-141, 154-157).  Plaintiff "cannot use

inadmissible hearsay to defeat summary judgment when that hearsay will not be

reducible to admissible form at trial."  *Pritchard v. Southern Co. Servs.*, 92 F.3d

1130, 1135 (11th Cir. 1996).  Second, even if the evidence were admissible,

Martens and Eddings are not similarly situated to Plaintiff because they neither

held the same job, nor shared similar duties or responsibilities.  Doc. 18-3 at 9-10;

Doc. 19 at 20-21.  Moreover, Plaintiff does not plead a failure to promote claim, so

the alleged denial of promotional opportunities to women does not help to support

her contention that gender animus factored in her discharge.  Third, Plaintiff fails

to present any evidence to show that George lacked valid justification for

promoting Martens to an intermediate position or for confronting Priselac for

padding her mileage reimbursements.  Likewise, Plaintiff fails to present any

evidence to show that Defendant had no valid grounds for discharging Pellegrino

or promoting Eddings to an intermediate position.  Instead, Plaintiff relies solely

on unsupported assertions of discrimination.  However, "an inference based on

speculation and conjecture is not reasonable" and is insufficient summary

judgment evidence.  *See, e.g., CBS Broadcasting, Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 517 n. 25 (11th Cir. 2006) (internal quotation and citation omitted).

Plaintiff failed to establish that Defendant's articulated reasons for her discharge are pretextual.  The alleged mistreatment of other women and other improprieties she cites have no evidentiary support.  In fact, the record flatly contradicts some of her contentions.  Where, as here, Plaintiff cannot show that Defendant's reasons for her discharge are pretextual, summary judgment is warranted.

## C.    Plaintiff's general age and gender discrimination claim fails.

Plaintiff contends also that Defendant discriminated against her by offering her two weeks of severance on June 3, 2008, instead of the purportedly four weeks Defendant offered to Tom Parker.[8]  Doc. 18-1 at 31 (Dep. pp. 118-119).  Plaintiff's reliance on Parker is misplaced since she cannot show that she and Parker are similarly situated.  *See Alvarez*, 2010 WL 2631839, at *7 (plaintiff must show that she "was subjected to adverse employment action in contrast to similarly situated

---

[8] Defendant contends it offered Parker the same severance as Plaintiff – two weeks.  Doc. 18-3 at 8.  However, the severance it attached to support this contention shows only that Parker received $2500.  *Id.* at.15.  The Court does not know Parker's salary and has nothing to establish that Parker, in fact, only received two weeks severance pay.  Accordingly, for this analysis, the court will assume that he received four weeks severance pay, as Plaintiff contends.

employees outside [her] protected class.").  Parker had a different supervisor and

lost his job on February 2, 2007 – nineteen months before Plaintiff, (doc. 17 at 15;

doc. 18-3 at 8-9, 15,18).  Moreover, Defendant hired George, Plaintiff's

supervisor, <u>after</u> Parker's termination. Doc. 18-3 at 8.  Plaintiff failed to present

any evidence to establish that George knew about Parker's severance, or that she

and Parker shared a common middle manager who had such knowledge or shared

the same supervisory chain of command.  *See Anderson v. WBMG-42*, 253 F.3d

561, 566 (11th Cir. 2001) (employees with different lower-level managers may

still be similarly situated if they "fell within the primary responsibility of one

middle manager and the same supervisory chain of command." ).  In short,

Plaintiff cannot rely on Parker's alleged favorable treatment to establish pretext

when, as here, she has no evidence that she and Parker fell within the same

supervisory chain of command, Plaintiff's supervisor (George) had no

involvement in Parker's termination, and there is no evidence that George even

knew about it.  *See, e.g.*, *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1273

(11th Cir. 2004) ("When comparing similarly situated individuals to raise an

inference of discriminatory motivation, the individuals must be similarly situated

in all relevant respects besides the [protected trait], since different treatment of

dissimilarly situated persons does not violate civil rights laws.") (internal

quotations and citations omitted).

Plaintiff's failure to pin Parker's severance on George is even more telling in light of her testimony that George also offered two weeks severance to a male employee, Evan Franklin.  Doc. 19 at 8; doc. 18-1 at 31-32 (Dep. pp. 120-121).  Essentially, the evidence before this court is that George only had a role in two severance offers – to Plaintiff and Evan Franklin – and treated both the same by offering each two weeks.  Under these facts, Plaintiff's sex and age discrimination claims fail since George treated her no differently than Franklin or other similarly situated employees.[9]  *See Jackson*, 372 F.3d at 1274 (the fact that a white employee was treated identically to the minority employee "undercuts any suggestion that [discrimination] was a motivating factor for the defendants' actions.").

Finally, to the extent that Plaintiff contends that Defendant's decision not to offer her a severance again when it discharged her on September 2, 2008 is discriminatory, this claim fails also because Plaintiff does not rebut Defendant's contention that she is not similarly situated to Parker, since, unlike Parker, she

---

[9] Plaintiff cites to Franklin's two weeks severance pay to support her contention that Defendant discriminated against her when it offered her two weeks severance.  She contends that she should have received more severance than Franklin since she had more years of service.  Doc. 19 at 8.  However, Plaintiff failed to offer any evidence to show that Defendant uses a formula based on years worked to calculate a severance package. *See* Doc. 18-3 at 8 ("Otto Bock does not have a company policy regarding severance payments upon termination.").

received a second opportunity to improve her performance.  In contrast, Defendant

contends that it terminated Parker immediately and gave him a severance when he

failed to improve his poor sales performance after it placed him on corrective

action.  Doc. 18-3 at 8-9.   The court notes that when George met with Plaintiff in

June, he offered her the option of termination with a two week severance, which

Plaintiff rejected.  Doc. 18-3 at 6.  As a result and in light of her getting credit for

a May billing error, George gave her two more months to improve her

performance.  *Id*.  This decision to give her two additional months to improve,

something she failed to show Parker received, is why Defendant contends that it

decided against giving her a severance when it discharged her three months later.

*Id*. at 8.

     While Plaintiff obviously disagrees with the decision to terminate her

without a severance, the anti-discrimination laws do "not take away an employer's

right to interpret its rules as it chooses, and to make determinations as it sees fits

under those rules."  *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187

(11th Cir. 1984).  Where as here, there is no evidence that Defendant gave a

severance to an employee outside Plaintiff's protected class after giving that

employee a second chance to improve their performance, the court simply cannot

find Defendant's decision to discharge Plaintiff without a severance

discriminatory.  Accordingly, the court grants Defendant's motion on Plaintiff's

general age and gender discrimination claims.

**D.**   **Plaintiff cannot establish *prima facie* elements of retaliation under Title VII and ADEA.**

Plaintiff alleges Defendant placed her on a second corrective action on June

13, 2008, and terminated her employment without severance on September 2,

2008, in retaliation for her filing an EEOC charge.  Doc. 19 at 16-17.  To establish

a *prima facie* case of retaliation, Plaintiff must show that: "(1) that she engaged in

statutorily protected conduct; (2) she suffered adverse employment action; and (3)

that there is some causal relation between the two events." *Alvarez*, 2010 WL

2631839, at *11 (internal quotations and citation omitted).  If she does, the burden

shifts to Defendant to offer a legitimate, non-retaliatory reason for the adverse

employment action.  *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th

Cir. 2002).  Plaintiff prevails if she shows that Defendant's articulated reason is

pretextual.  *Id.*

Defendant contends that Plaintiff cannot establish the necessary causal link

for a *prima facie* case.  Specifically, Defendant claims it contemplated  Plaintiff's

termination prior to Plaintiff complaining about discrimination or filling out an

EEOC online questionnaire and that George learned about the questionnaire well

after he advised Plaintiff that continued failure to meet her goals would result in termination.  Doc. 18-3 at 5-8.

Unfortunately for Plaintiff, the evidence supports Defendant's position. Specifically, George placed Plaintiff on a corrective action in March 2008.  Doc. 18-3 at 5.  The correction plan informed Plaintiff that she needed to meet the targeted goals to avoid discharge.  *Id*.  Significantly, Plaintiff conceded that she deserved the corrective action and promised to improve her sales for the next three months.  Doc. 18-1 at 25 (Dep. pp. 95-96).  When  Plaintiff failed to meet her sales quotas for May, George met with her on June 3, 2008, and gave her two options: discharge with two weeks severance or a demotion.  *Id*. at 28-29 (Dep. p. 106-110).

The next day, Plaintiff gave George a letter rejecting the two options, alleging discrimination, and claiming that the accounting department failed to record one of her sales for May.  Doc. 18-1 at 29 (Dep. p. 112); Doc 18-3 at 6.  On June 13, 2008, George revised Plaintiff's original corrective action to account for the accounting error and, although the revision did not erase Plaintiff's entire May shortfall, he gave her until the end of August to meet a new combined sales goal of $61,560 for July and August to retain her employment.  Doc. 18-3 at 6-7.

It was only <u>after</u> George met with her on June 3, 2008, *i.e.*, three months

Page 22 of  30

after he placed Plaintiff on corrective action and presented her with the option of a demotion or discharge, that Plaintiff mentioned discrimination.  A month later, Plaintiff filled out an EEOC questionnaire.  Doc. 18-1 at 38 (Dep. p. 146).

Rather than being retaliatory, George actually modified Plaintiff's original March corrective action for her benefit, *i.e.*, to account for the May billing error Plaintiff flagged and to afford her another opportunity to save her job by meeting reduced sales targets.  Doc. 18-3 at 6.  Significantly, this is a not a situation where Defendant had no justification to extend the corrective action.  To the contrary, even accounting for the billing discrepancy Plaintiff flagged, she still failed to attain the 75% of sales quota for May.  At that point, Defendant had valid justification to discharge her or, if it wanted, to give her another chance. Defendant chose the latter even though Plaintiff had not earned it.  Moreover, without the extension of the corrective action plan in June, Plaintiff would have had to meet 100% of her sales quota.  By extending the corrective action plan, George actually helped Plaintiff because the record here is undisputed that Plaintiff last met her sales quota in early 2007.  In other words, if George had not extended her corrective action plan in June, Plaintiff would have probably lost her job in July or August.[10]

---

[10] Again, Plaintiff only generated $10,749 in July and $16,471 in August, 26% and 40% respectively of the 75% reduced targets for those two months.  Doc. 18-3 at 7.

Because George advised Plaintiff that she faced termination long before her June 4, 2008 letter claiming discrimination and her July 3, 2008 EEOC questionnaire, (doc. 18-3 at 5), Plaintiff cannot establish a causal link between the protected activity and her placement on a second corrective action or her subsequent discharge. *See Saffold v. Special Counsel, Inc*., 147 Fed. Appx. 949, 951 (11th Cir. 2005) ("when an employer makes a tentative decision *before* the protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation") (citation omitted) (emphasis in original); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (plaintiff must provide sufficient evidence of the protected expression in relation to the adverse employment action).

Moreover, to say that an employer can never revise a corrective action plan, especially when the revision gives the employee another chance, simply because the employee complained subsequently about discrimination is essentially a referendum to make employees termination-proof.  Any employee sensing discharge would run to the EEOC or claim discrimination so that the employer would then be precluded from disciplining that employee.  Such a rule would not only create chaos by establishing a class of employees that are discipline-proof, but is also contrary to established law.  *See, e.g.*, *Alvarez*, 2010 WL 2631839, at

*13 ("We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint.").  Accordingly, Defendant is due summary judgment on the retaliation claim for the June corrective action and the discharge.

Next, Plaintiff claims that Defendant's refusal to pay her a severance is also retaliatory.  Doc. 19 at 16.  Plaintiff overlooks that Defendant did not have a corporate severance policy entitling her or any employee to benefits post-termination.  Doc. 18-3 at 8; Doc. 23.  She also overlooks that Defendant offered her a severance initially in exchange for her voluntary termination, (doc. 18-3 at 5), which she rejected, (doc. 18-1 at 29-31 (dep. pp. 112-118)).  Defendant's offer of severance in exchange for her voluntary resignation is not a promise or a guarantee that Defendant owed Plaintiff a severance if and when it terminated her. *See Equal Employment Opportunity Comm'n v. SunDance Rehab. Corp.,* 466 F.3d 490, 502 (6th Cir. 2006) (failure to pay severance, not otherwise owed or specifically promised, does not amount to an adverse action in a retaliation claim because it is not a benefit given or owed to similarly situated employees);  *Kiehl v. Univ. Hosp. Health Sys.-Heather Hill, Inc.*, 2009 WL 1586326, at *8 (N.D. Ohio June 4, 2009) (the possibility of severance in exchange for voluntary resignation

does not establish that a plaintiff is owed or promised a severance upon termination).

Significantly, there is no evidence here showing that other similarly situated employees received a severance. Plaintiff points instead only to Tom Parker and Evan Franklin, who, like her, Defendant offered a severance, but who, unlike her, accepted it. To support her retaliation claim, at a minimum, Plaintiff must refute Defendant's contention that it decided not to give her a severance because, after she rejected it on June 4, 2008, it gave her two additional months instead to improve her performance. Plaintiff does not rebut Defendant's contention and provides no evidence of similarly situated individuals who received a severance at termination <u>after</u> Defendant extended their probationary periods. In other words, there is no evidence to show that Defendant's articulated reasons are pretextual.

Plaintiff's retaliation *prima facie* case fails because she failed to present any evidence of a causal link between her complaints of discrimination and the adverse employment actions she challenges. Alternatively, her retaliation claim fails also because she cannot rebut Defendant's articulated reasons for extending her corrective action, her discharge thereafter, or for not offering her a severance.

**D.    Plaintiff does not have sufficient evidence to support her state law claims.**

Finally, Plaintiff alleges that Defendant wrongfully withheld commissions due to her in violation of Alabama's Commercial and Consumer Protection code. Under Alabama law, an employer must pay, within thirty days, all commissions due at the time of termination. Ala. Code § 8-24-2(c).   However, to recover under this statute, Plaintiff must prove the existence of a contract and the actual withholding of commissions owed.  *Id.*  Plaintiff cannot do so.

Although Plaintiff concedes that she and Defendant never entered into an employment contract, she asserts that the corrective action plan she received in March 2008 created, at least in her mind, a contract that she "needed to do X, Y, and Z, and I did that . . ." in order to retain her employment and receive compensation.[11]  Doc. 18-1 at 30 (Dep. p. 115).  First, Defendant's handbook is silent on the payment of commissions post-termination and states unequivocally that employment is at-will.  Doc. 18-2 at 31.  In other words, Plaintiff cannot establish with certainty the existence of a contract entitling her to commissions that would render Defendant liable for breach.  Second, even if Plaintiff is correct that the corrective action created a contract, she breached it by failing to meet its

---

[11] Actually, Plaintiff failed to meet the conditions of her corrective action plan, and hence the reason Defendant discharged her.

conditions in May, July, and August.  It is basic hornbook law that to recover under a contract, a party must perform. 17B C.J.S. *Contracts* § 549 (2010). Accordingly, Plaintiff's claim under the Alabama commissions statute fail.

Likewise, Plaintiff's claims for conversion and unjust enrichment fail because she cannot meet her burden of showing that Defendant withheld funds due to her or unjustly enriched itself at her expense.  *See Southtrust Bank v. Donely*, 925 So. 2d 934, 939 (Ala. 2005) ("To establish conversion, one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property.") (internal quotations and citation omitted); *Jordan v. Mitchell*, 705 So. 2d 453, 458 ("One is unjustly enriched if his retention of a benefit would be unjust [and] [r]etention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship.").  Plaintiff failed to point to the specific commissions she claims Defendant denied her, and, in fact, testified "I don't know" when asked how much in commissions Defendant purportedly failed to pay her.  Doc. 18-1 at 41 (Dep. p. 160).  Instead, although she has the burden of proving her claim, she contends vaguely only that she believed

Defendant denied her some unknown commission.  Naked contentions without any factual basis fail to meet the requisite pleading standard to survive a motion to dismiss (*see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))), and, likewise, are also insufficient to survive summary judgment.  Accordingly, Plaintiff's state claims fail as a matter of law.

## V.  CONCLUSION

Plaintiff failed to establish a *prima facie* case of disparate treatment, unlawful termination and retaliation under Title VII and the ADEA, or to rebut Defendant's articulated reasons for the employment actions she challenges. Specifically, Defendant discharged Plaintiff because of her continued failure to meet targeted sales goals, despite receiving two opportunities to improve. Significantly, Plaintiff acknowledged that she failed to meet the sales target and failed to point to any other employee Defendant retained who had similar performance issues.  As to the severance claim, Defendant offered one to Plaintiff, which she rejected, leading, in part, to Defendant extending her probationary

Page 29 of  30

period.  She failed to present any evidence to rebut Defendant's contention that it denied her a severance because it extended her probationary period.  Accordingly, Defendant's motion for summary judgment is GRANTED, and the action is hereby DISMISSED with prejudice.

Done and ordered this 29th day of July, 2010.

**ABDUL K. KALLON**
**UNITED STATES DISTRICT JUDGE**